All right, that case is submitted. We'll go to case number three. Smith v. Dewberry, 23-13217. Mr. Stablen, Ms. Stablen here for the appellant, Ms. Cusimano for the appellees. Ms. Stablen, whenever you're ready. Thank you, Your Honor. Thank you, Honors, and may it please the Court. My name is Taylor Stablen, and I represent the appellant, Mr. Lester Smith. Mr. Smith and two other inmates warned the deputy warden and unit manager that another inmate had a knife and was threatening to stab Muslim inmates in their cell block. In response, the deputy warden just laughed and said, what do you want me to do, lock him up? Neither official investigated, and just two hours later, Mr. Smith was stabbed by the exact individual he warned the officials about. Now, the district court granted qualified immunity to the officials, but this court should reject that analysis because, first, there are factual disputes as to the officials' awareness and deliberate indifference to a substantial risk of harm. And second, clearly established law at the time of the incident gave the officials fair warning that their conduct was violating Mr. Smith's Eighth Amendment rights. But just so we're clear, what — with respect to the second argument that you've made, what is the clearly established law? Are we in what I would call bucket one of qualified immunity or bucket two? Bucket one being — Bucket. Yeah, sorry. Bucket one being materially indistinguishable cases, bucket two being clearly, you know, sort of a principle of broader applicability. We're in both bucket one and bucket two. Okay. Well, talk to us about each bucket, I guess. Okay. So going to what you deemed bucket one, the materially similar case law, that case is Rodriguez v. The Secretary for the Department of Corrections. That is a published case from this Court from 2007. And that is materially similar to this one because the risk factors at play in that case are very similar to the risk factors at play in this one, notably gang tensions in that particular prison, which led to an individual being stabbed a mere few hours after he warned an individual in a position of power. There was the assistant warden. He needed help. He needed to be moved out of that particular area to avoid this violence. Can I — Go ahead. Wasn't Rodriguez — and Rodriguez wasn't the plaintiff — threatened on multiple occasions and reported that threat to prison officials several times? That is correct. In Rodriguez, it was two times at least that he went and reported this to the officials. But we actually have facts in the record here that are pretty similar to what happened in Within that two-hour time frame, according to Mr. Smith's deposition at Docket Entry 144-6, he actually went to another non-party official and warned Officer Pierre that he was getting these threats from Mr. Miten, asked for help, in which that individual said, if my supervisors didn't do anything, I can't do anything either. So he did try to step in and make multiple reports to the officials about multiple threats that he was having, which falls in line with what happened with Rodriguez. Isn't there another, though, pretty key distinction between this case and Rodriguez in the sense that the warning that your client gave the prison officials here would suggest that he thought that the perpetrator would be the instigator, right? But here, that's actually just sort of like not what happened. Someone else hits perp on the head. He turns around and stabs your client and then chases the other guy. So it does seem like, I know the government has said sort of like wrong place, wrong time. It does sort of feel like that. And that distinguishes this case from Rodriguez as well, right? It doesn't distinguish this case from Rodriguez because the issue is what the prison officials had subjective knowledge of at the time of the warning. And here, they had subjective knowledge of multiple risk factors at play in this case that make this more than a mere possibility of harm, more than just some generalized risk, but a substantial risk of harm to which the prison officials were deliberately indifferent in violation of Mr. Smith's Eighth Amendment rights under the Supreme Court's holding in Farmer v. Brennan. And even further, looking at the clearly established law inquiry, the district court looked at this through the wrong lens. It actually fixated on this idea of materially similar case law. But that looks very similar to the Eleventh Circuit test that the Supreme Court rejected in Hope v. Keltser as an unduly rigid gloss on the qualified immunity analysis. It was a bit too narrow. And because of this, the core question is, did the officials have noticed that their conduct was violating Mr. Smith's Eighth Amendment rights? Can I ask you one more question about Rodriguez? Is Rodriguez distinguishable from this case as a matter of law in the sense that in Rodriguez, I think, right, like the way deliberate indifference claims work is first there's got to be, you know, sort of an objectively serious risk, right? And then there's got to be at Step 2 subjective knowledge of the risk and what we'll just short-form it, an unreasonable response to that risk, right? In Rodriguez, didn't we only answer the first of those two Step 2 questions? We said subjective knowledge, and then we sort of stopped there, didn't address the reasonableness of the response, and sent it back. No, this is not distinguishable from this case because the core inquiry here with regard to whether there was an Eighth Amendment violation at all is the issue of subjective knowledge, and on that point, I can move to the subjective knowledge of the prison officials at the time that put them on notice that they should have done something. The issue here is that they didn't do anything at all to remedy that risk. Now, turning to the district court's analysis of this, the issue is that it failed to acknowledge that there are actually multiple people that stepped forward to report multiple threats. Instead, the district court held that a single threat standing alone is insufficient to qualify as a substantial risk of harm. But here we don't have a single threat, nor is it standing alone. We have multiple risk factors at play in this case that make this more than a mere possibility of harm, but rather a substantial risk. So turning to the number of people that reported this particular threat, at docket entry 144-6, which is the excerpts from Mr. Smith's deposition that the prison officials filed alongside their motion for summary judgment, Mr. Smith tells the story of when he went and reported this threat to the officials. He said there was actually already two individuals who were talking to the officials reporting these same threats by Mr. Miten. When he approached another one of those individuals said, Miten is down in the dorms making these threats. Threats being plural, signaling multiple threats. The three agreed that it was a situation that was bound to lead to violence, and they asked these officials to step in and do something to mitigate that harm. And Mr. Smith actually corroborated this story after the two other inmates talked about their experience with the threats. So because of this, this contradicts both the magistrate judge's recommendation and the district court order adopting it, which failed to acknowledge that there were actually two other people that not only corroborated those threats, but experienced them themselves. Because of this, it's not a singular threat, but rather multiple threats against multiple people reported by multiple people. Who did those other inmates make these reports to? It was the same individuals that Mr. Smith made the reports to, so the deputy warden and the unit manager. And this is all functioning within the backdrop of an especially violent prison. Now this is an idea that we mentioned in our 28J letter, highlighting the Department of Justice's report released earlier this year on October 1st that studied Georgia prisons and how they are especially violent. And Hayes State Prison, where these individuals were incarcerated, is mentioned by name on that report for potential Eighth Amendment violations for how dangerous it is. So does that go to the subjective knowledge? Or what does the DOJ investigation mean for our purposes in terms of knowledge? Because DOJ has been, at least, doing these kinds of investigations. What weight should we place on those investigations when it comes to knowledge? The purpose of the investigation in terms of this case is that it puts the officials on notice that these kinds of things are happening in this particular prison. And this court held in its prior case law in Purcell v. Toombs County that while things like occasional or one-off instances of violence may not be enough to constitute an Eighth Amendment violation, but incarceration in a prison where violence and terror reign, that is where it becomes actionable. In that context, though, does that mean that any report by an inmate that a gang member made a threat would constitute a substantial risk of harm? No, Your Honor. It's not any report, but it's a report that carries the risk factors that we have here. So here, the key to this case is that there was a weapon involved. This wasn't just some empty threat by an individual with an inability to carry it out. It's that these inmates went to the prison officials and said, this person has a knife. He's threatening me with a knife threatening to stab me. That's the problem in this case. But then I think to Judge Newsom's point, and some will debate whether or not it matters, when the incident occurred, Mr. Smith actually wasn't the target. So to the extent he complained that someone is trying to harm me, that person actually wasn't trying to harm him, at least at that point, how is that still an Eighth Amendment violation as to Mr. Smith? Hindsight with regard to the actual incident that sparked Mr. Smith getting stabbed doesn't change the analysis, nor does it change the subjective knowledge that the prison officials had at the time. Here, this was a specific threat made against specific people because there was a religious dispute in this cell block that ultimately led Mr. Miten, the assailant here, to go back to his prior gang affiliation, gain access to a contraband weapon, and ultimately stab Mr. Smith. Regardless of whether Mr. Smith instigated the incident or not, the issue is that he went to the officials, said this person has a knife, is specifically threatening me, as shown through his deposition excerpts, and the prison officials didn't do anything at all. Let's say that you are correct in terms of notice. No one, I don't believe, in the briefs is talking about the fact that there was only a two-hour time span between the report and the incident. Is anyone arguing that that should play or have any impact in terms of ability to respond? No, that does not impact the argument here. Our argument is not that every single time there's some sort of threat or some sort of warning given to a prison official by an inmate, the official has to drop everything and do everything in their power to mitigate that threat. Our argument is much narrower than that, and it's that when you have these risk factors, namely multiple people reporting multiple threats by a person with a knife, with underlying religious and gang tensions, there is a responsibility to do at least some minimal degree of investigation. And the prison official's choice instead to do nothing should not be protected by qualified immunity. That is why this court should reverse. I actually have one more question. Do you think that the magistrate judge, and therefore the district court, followed this court's mandate in its revised order? We do not think that the mandate was followed in the revised order because the mandate was to review the prison official's citations to the record in the light most favorable to Mr. Smith as the non-moving party in a motion for summary judgment. And because there are multiple discrepancies between those record sites and the district court's opinion, we do not think the mandate was followed here. Thank you. Thank you very much. You've got your rebuttal time remaining. Ms. Cusimano, let's hear from you. Good morning, and may it please the Court. I'm Ellen Cusimano on behalf of Deputy Warden Dewberry and Unit Manager Averitt. I want to start just with the general fact that this court has recognized on multiple occasions, which is that threats between inmates are very common. They happen all the time. And so when a prison official receives a report of a threat, the Constitution does not require them to drop everything that they're doing and immediately act every single time. In fairness, the record here is not great for you, right? I mean, like, all they really got, all he really got in response was kind of mockery. Well, I think that the word that Mr. Smith uses in his deposition testimony is nonchalance. And I think that actually cuts in, perhaps in our client's favor, because this, again, is a subjective inquiry, and it shows that they really did not think that this was a serious threat. And so really the key here... But they're notified that an inmate has a weapon, and even if they don't know to whom that weapon is going to be directed, they know that in a dangerous prison that DOJ is already investigating, they have a report of an inmate who has a weapon. Why is that, in and of itself, not serious enough to warn an investigation? Several things. Number one, that's just a report. There's no evidence that my clients actually saw a gun on Mr. Mighton or had received any other reports of there being a gun. And then we also have to consider that... Is it a gun or a knife? Is it a gun or a knife? Oh, I'm sorry, a knife. I was going to say we have bigger problems than we realize. And then I think we still consider that within the context of what my clients knew and didn't know. So here's what my clients were not told. They were not told the specific words that Mr. Mighton made to the inmates. They were not told about the larger context that the threat was made in. So... Wouldn't that all come out in an investigation? I mean, that's the point. Instead of a nonchalant response, it would be all of the questions you just posed. But they don't have a duty to do that until they subjectively believe that the risk of harm is a strong likelihood versus a mere possibility. And they simply just don't have enough context and specific information here to know that. It's also important to understand what my clients... What my clients... The evidence that my clients didn't have. There's no evidence in the record that my clients knew of any prior altercations between Mr. Mighton and Mr. Smith or Mr. Mighton and any other inmates. Were they aware of the DOJ investigation? I don't believe there's evidence in the record of them being aware of the DOJ investigation. If they were aware of the DOJ investigation, would that undercut everything you just said they did not know? No, because, again, this is a very subjective inquiry into the specific threat that was relayed to them by Mr. Smith given by Mr. Mighton. And there's just not any... I would also mention that the DOJ reports and the results of that, that's not in the record anywhere in this case. So, no, I don't think that would have... Sorry, I have a cold. I don't think that would have changed the situation at all. Here's a problem that I have is that really none of this, as far as I can tell, is thoroughly addressed in the district court's opinion. And you may well be right, but a panel of this court last time remanded it to the district court to fully consider the record in the light most favorable to Mr. Smith. And what I saw in the magistrate judge's revised report, which was again adopted by the district court, was some add-on paragraphs, mostly of law, and really no further analysis of the facts. Maybe there was one additional point somewhere. I can't even remember. But I was frankly a little bit surprised by that. Do you think that the magistrate judge and ultimately the district court followed this court's mandate from the prior iteration of this case? I think it did. I would direct this court's attention to page 4 of the report and recommendation. In that, on that page, they do recite all of the facts about the conversation that Mr. Smith had with my clients about Mr. Miden's threat. And they explicitly set forth the very evidence that they failed to consider the first time around on the appeal. And then on page 9, the report and recommendation reaches the conclusion that even though the record shows that Mr. Smith told Dewberry and Everett that Miden had a knife and made a single threat against him, he did not give Dewberry and Everett any other risk factors that would constitute a substantial risk of harm, end quote. And so that's essentially the court's analysis. Now, I understand that Mr. Smith may have wanted a more detailed analysis, but I don't think district courts are required to do that. I think what they did here is perfectly sufficient, especially when you think about this court's standard of review. It's a de novo standard of review, not necessarily a deep dive into every single thing that the district court said below. So I do think that the district court complied with this panel's order. Another point that I want to make is one that you've already brought up, which is that what actually happened here is Mr. Smith told my clients about this threat as he was leaving to go to lunch. And when he came back from lunch, that's when this incident happened. And Mr. Mighton is not the one who started the incident. So the risk of harm that my clients were notified of didn't even come to fruition here. Instead, it was instigated by a different inmate, which I think really undercuts the argument that there was a serious risk of harm from Mr. Mighton. Well, if nothing else, I mean, the complaint is that Mr. Mighton is dangerous, he has a weapon, and he's been threatening folks. And that's kind of what happened, right? I mean, he had a weapon, he threatened folks, he hurt Mr. Smith, ran after somebody else. So, I mean, I guess I don't understand how the complaint deviates so much from what actually happened here. Well, he was defending himself from an attack that was instigated by somebody else. He was not actually the one making the attack in this case. Some other facts that I want to bring the court back to is that there's no evidence in the record that my clients knew of any sort of—that Mr. Mighton had an assault of nature. They weren't aware of any sort of larger religious conflict in the dormitory. They weren't aware of any sort of even nonviolent conflict between Mr. Mighton and the other inmates. And those are all factors that kind of tip the scale to making this— to turning this from being a mere possibility to a strong likelihood. So I guess really the crux of my argument here is that maybe my clients knew of a possibility of harm. But they didn't have enough specific information about the context of the harm, what the harm actually—or the threat, and what the threat actually said to be subjectively understanding that this was a strong—this posed a strong likelihood as opposed to just a mere possibility. So you're saying, and I want to clarify for this case or all similar cases, that the complainant needs to be as detailed as possible with the complaint for notice to be sufficient as opposed to a general statement regarding fear and then it being the correction officer's responsibility to investigate? The onus is on the complainant to provide all of that information that normally would come out through further investigation? Yes. I think the precedent from this Court is clear that just simply telling a prison official about a threat is not enough. They have to tell them more information. And I'm not aware of any cases that place the onus of actually going and investigating and getting that information on the prison officials. And if that is the law, then I would argue that the law is not clearly established on that point. And so qualified immunity would still apply. And so I guess now is a good time for me to turn to the clearly established part of qualified immunity. I disagree that Rodriguez clearly establishes the law for the reasons that you all have already mentioned. In Rodriguez, we have a very specific threat that a gang member is going to kill Rodriguez when he's released from segregation. We also have evidence that the prison officials were aware of gang issues throughout the entire prison. We don't have any of that information here. The last thing that I want to address is that Mr. Smith has indicated that perhaps he's also bringing a different type of failure to protect claim, one that's based on generalized violence throughout the entire prison. I have two things to say about that. Number one, he abandoned that argument by not making it in the most recent appeal. And then the second argument I would make is that even if we set the abandonment issue aside, there is a very steep evidentiary burden to carry to show that there is prevalent violence throughout the entire prison, and Mr. Smith has not shown that here. He's not provided the amount of evidence that you need to make that showing. He did give one statistic about the number of assaults that happen in a six-year period, but he doesn't provide any other context about those assaults. So, for example, he doesn't say how many prisoners were residing in the prison at the time. He doesn't say where in the prison those assaults occurred. Those are all contexts that this court has made clear plaintiffs have to provide to the court in order to make out that type of failure to protect claim. I know that I still have three minutes left, but I've said everything that I wanted to say, so if this court has any additional questions, I'm happy to ask them or answer them, and then I will turn it back over to my colleague. Okay, very well. Thank you so much, Ms. Guzmano. Thank you. Ms. Stablein, and I'm sorry if I mispronounced your name, the first to go around. Ms. Stablein, you have four minutes remaining. Thank you, Your Honors, and may it please the Court. First, this was not nonchalance. This was total indifference to a significant risk of harm to these three inmates that came forward to warn the prison officials of a risk of harm. Now, the prison officials were told of specific threats and specific risk factors at play in this case. They were told, according to docket entry 144-6 at page 5 of Mr. Smith's deposition excerpts, that this individual was threatening to hurt some of Mr. Smith's Muslim brothers. This puts the officials on notice of not only this threat, but also the fact that there were underlying religious tensions in this particular cell block. And turning to the Rodriguez case, all the officials were told in Rodriguez was a threat to kill the particular individual. That's very similar to the specific wording as shown in Mr. Smith's deposition excerpts. Can I ask you a quick question? If we think that Rodriguez is insufficiently close, talk to us about Bucket 2. You never really got to Bucket 2 in your opening, but talk to us about Bucket 2. Yeah. Bucket 2 still supports this case continuing past the motion for summary judgment stage, and that's because this court has held as a general legal principle that should govern the novel aspects of this case that a total failure to investigate or otherwise mitigate the substantial harm that another inmate poses is deliberate indifference in violation of the Eighth Amendment. That particular quote is coming from the Caldwell v. Warden case, but there are also other cases that have touched on this issue as well, notably the Marsh v. Warden case that says that looking for specific features that make a prison especially violent is also important to this particular analysis. And turning to the facts of Marsh, in that case it was a six-year time frame and the individual only provided evidence of 15 different inmate-on-inmate assaults that he had witnessed. Can I ask you just sort of a theoretical question about Bucket 2? I find Bucket 2 a little mysterious. So Bucket 2 talks about like a broad legal principle not tied to the facts of a specific case, right? But necessarily legal principles are articulated against the backdrop of specific facts in specific cases. So how do we determine whether a legal principle has sort of like transcended the facts of a case and become what we would call, you know, sort of broad? How does that happen? A legal principle becomes applicable to this particular case when the facts are so similar that it makes sense to apply it, if that makes sense. So turning to Caldwell, although the very specific facts may not render that case materially the same as the facts of this case, the broad legal principle of a total failure to investigate does apply to this case because that's something that happened. And it's a total failure to investigate a substantial risk of harm. And that's precisely what we have here because of the risk factors at play. Notably, we have multiple people coming forward to report multiple threats by an individual with a weapon, a person that has a violent background that is classified as a PREA aggressor. And these individuals that were given that notice, the deputy warden and unit manager, are in security-based supervisory positions where they have a responsibility to know things like security issues, to know things like classification issues in these particular cell blocks. That would render Mr. Mighton as a PREA aggressor, especially violent, if he's making threats, especially if he has access to a weapon. That is why this Court should reverse the district court's holding and instead allow Mr. Smith to continue in his efforts to vindicate his constitutional rights. Thank you. All right. Very well. And, Ms. Stablein, let me just note for the record that I see that you're a law student practicing under the supervision of your clinic director. Well done. Thank you. All right. So that case is settled.